UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:19-CR-59

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL INFORMATION |
| | ) | |
| PAMELA GRACE FAULKNER | ) | |

The United States Attorney charges that:

I. STATUTORY AND REGULATORY BACKGROUND

A. GENERAL BACKGROUND ON MEDICAID

1. The Medicaid Program was enacted by Congress on July 30, 1965, under Title XIX of the Social Security Act. Medicaid is a federal health care benefit program that helps pay for medically necessary services for low-income families and individuals, including children, parents, pregnant women, seniors, and people with disabilities. Medicaid is funded jointly by the federal government and the states, and is administered by state governments within federal guidelines. In North Carolina, Medicaid is administered by the North Carolina Division of Health Benefits (DHB) which is within the North Carolina Department of Health and Human Services. The Medicaid program and DHB are collectively referred to herein as Medicaid.

1

2. If qualified, individuals can enroll to become Medicaid recipients. At the time of enrollment, a recipient receives a unique alphanumeric identifier that is issued by the program. This code is known as a Medicaid identification number. Similar to traditional insurance, recipients may use their Medicaid identification numbers to receive covered medical services.

3. Medicaid recipients receive services from medical practitioners and companies referred to as Medicaid providers. Once a provider enters into a contract with Medicaid, the program issues a unique number to the provider, known as the provider number. Providers must also obtain a federal identification number, known as National Provider Identifier, or "NPI" number. All Medicaid providers must certify that they will only bill the government for services that they actually render.

4. After a provider renders a covered medical service to a Medicaid recipient, the provider may bill Medicaid for the reasonable and necessary costs of the service. To bill Medicaid, providers generally send an electronic claim via the internet to a processor for the program.

5. In each claim transmission, the provider must enter truthful information concerning the services it performed. Each claim submitted to the Medicaid program is required to state a

diagnosis code, the client's name and Medicaid identification number, a description of the service provided, the date of service, and the applicable billing code. The Medicaid program could not process a claim without receiving a valid Medicaid identification number establishing the patient's identity and eligibility. Providers are not required to submit copies of medical records or other forms of proof to justify the claim, but they are required to maintain such documentation and make it available upon request.

6. Once DHB's fiscal agent has processed the electronic claims, the provider is paid by funds being electronically transferred into the provider's designated bank account. The provider is also provided with regular remittance advices (RA) from the Medicaid program providing them with a detailed record of all paid claims.

  B. OUTPATIENT BEHAVIORAL HEALTH SERVICES ("OBHS")

7. One type of service that the Medicaid program provides to eligible recipients is Outpatient Behavioral Health Services ("OBHS"). OBHS include assessments, individual, family, and group therapy, psychiatric medication management, and psychological testing. OBHS focuses on reducing psychiatric and behavioral symptoms in order to improve the recipient's functioning in familial, social, educational, or occupational

3

domains.

8. Each provider of OBHS is required by Medicaid to maintain service notes and other medical records for a period of six years in order to document and substantiate any reimbursement requested from Medicaid. Not only are the service notes a requirement under Medicaid policy, they are necessary to ensure that these recipients receive the care that the Medicaid funds are designated to provide, by giving an account of the efficacy of the OBHS.

9. For OBHS, Medicaid policy requires the minimum documentation for a recipient's file:

- Recipient's demographic information;
- Written consent for treatment signed by the recipient or the recipient's parent or guardian;
- Copies of any testing, summary and evaluation reports;
- Documentation of entrance criteria, continued service criteria, and discharge criteria;
- An individualized treatment plan;
- Service note for each date of service;
- Signature and credentials of the clinician providing the service;
- Recipient's name, service record number, and Medicaid identification number on each page;
- Duration of services rendered (length of assessment or treatment in minutes);
- All evaluations, notes and reports must contain the full date the service was provided (month, day, and year); and
- Documentation of communication regarding coordination of care activities.

10. Providers are only allowed to bill for OBHS that are medically necessary and are provided by a qualified clinician who meets the requirements set forth in DHB's clinical policy. Each

4

claim must specify the actual clinician responsible for rendering the OBHS. The qualified clinician must have their own individual Medicaid provider number.

## II. FACTUAL BACKGROUND

11. During times material to this Information, PAMELA GRACE FAULKNER was the registered agent and sole officer of Skeen Services, Inc. (hereinafter "Skeen").

12. Skeen had offices in Greensboro, Greenville, Lumberton, and Wilson, North Carolina. Skeen was a Medicaid provider enrolled with DHB and authorized to provide OBHS to recipients in the Eastern District of North Carolina.

13. Renee Christine Borunda was the individual who submitted electronic Medicaid claims on behalf of Skeen.

14. A.E. was a therapist at another company where Borunda was the manager. A.E. never worked at Skeen, in fact, A.E. had not heard of Skeen or FAULKNER. Borunda obtained A.E.'s individual Medicaid provider number, xxxxxx6168, and then used it when submitting fraudulent Medicaid claims for Skeen.

15. From September 13, 2013 to September 6, 2014, while billing for Skeen, Borunda submitted to DHB's fiscal agent approximately 4,588 fraudulent claims involving 199 different recipients using A.E.'s Medicaid provider number, xxxxxx6168,

5

indicating that A.E. rendered services to the recipients. Borunda knew that A.E. had not rendered services to these recipients. Borunda had listed A.E.'s Medicaid provider number, xxxxxx6168, as the rendering provider in Skeen's claims without A.E.'s knowledge.

16. Borunda was located in Pitt County and Wilson County in the Eastern District of North Carolina when she submitted the fraudulent claims. Based on these claims, DHB's fiscal agent paid Skeen for providing OBHS to recipients from Beaufort County ($4,065.72), Greene County ($3,868.95), Guilford County ($9,772.23), Lenoir County ($690.60), Mecklenburg County ($298.28), Pitt County ($148,045.80), and Wilson County ($38,776.98), when, in fact, no such services were rendered. (Total amount paid for the fraudulent claims was $213,927)

17. MID interviewed 13 families that had 36 members for whom Borunda had submitted claims indicating that A.E. had provided them services at SKEEN. The interviewees indicated that they and their children did not receive services from A.E. nor did they know A.E. Some recipients had never received OBHS from anyone. Other recipients indicated that they had received services from other clinicians at Skeen in prior years, but they had not received any services during the time period for which the A.E.'s claims were submitted. Skeen had submitted and been paid for the earlier

claims before Borunda submitted the fraudulent claims listing A.E. as the rendering provider. Because these recipients were already clients of Skeen, Borunda and FAULKNER had access to these recipients' medical records which contained the recipients' Medicaid identification numbers. Borunda used these Medicaid identification numbers when submitting the fraudulent claims listing A.E. as the rendering provider. Although Skeen did have some service notes and documentation for the earlier dates of service, Skeen did not have any service notes or other documentation to support the services for the later claims in which A.E. was listed as the rendering provider.

18. FAULKNER was aware that Borunda was submitting fraudulent claims to Medicaid for services that were not rendered. In fact, FAULKNER and Borunda entered into an oral agreement to split the monies Skeen received for such fraudulent claims. Additionally, on numerous occasions, FAULKNER provided Borunda with the names of SKEEN clients for whom she wanted Borunda to submit claims to Medicaid for knowing that Skeen had not provided the services for which she wanted Borunda to bill Medicaid for. On multiple occasions, she provided recipients' names to Borunda via email. Once, three minutes after emailing information to Borunda on six recipients, FAULKNER sent another email to Borunda stating "please

7

tell me how much it is. I need at lease 10K. I need 3500 for you. got some major bills."

19. DHB's fiscal agent paid Skeen $213,927.55 for the fraudulent claims that Borunda had submitted listing A.E. as the rendering provider. These funds were directly deposited into Skeen's SunTrust Bank checking account, xxxxxxxxx8496. FAULKNER had signature authority on this account, but Borunda did not have signature authority on this account. FAULKNER signed the checks written from this account. From approximately May 2013 through July 2014, FAULKNER paid Borunda approximately $144,000 via 44 checks from Skeen's SunTrust Bank checking account, xxxxxxxxx8496. Faulkner had written "Contract" on the memo line of forty-two of the checks.

20. Borunda stated the most FAULKNER paid her at one time was $12,000, and on that occasion, FAULKNER paid $4,000 of Borunda's $12,000 to Borunda's husband, B.H. B.H. never worked for Skeen. Borunda stated that FAULKNER explained that the reason FAULKNER wrote the $4,000 check to B.H. was because FAULKNER's accountant or lawyer told FAULKNER not to write a check to Borunda for that much ($12,000). Bank records show that FAULKNER wrote two checks from Skeen's SunTrust Bank checking account, xxxxxxxxx8496, to B.H.: one check was written on November 6, 2013

8

for $4,000 and one check was written on May 7, 2014 for $3,000.

## COUNT ONE
### *Conspiracy to Commit Health Care Fraud*
### *18 U.S.C. § 1349*

21. Introductory Paragraphs 1 through 20 are realleged and incorporated by reference into this Count.

### The Conspiracy

22. From on or about May 9, 2013 and continuing up to and including on or about September 12, 2014, within the Eastern District of North Carolina, PAMELA GRACE FAULKNER, did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with others known to the United States Attorney, to commit offenses against the United States, to wit, to knowingly and willfully execute and attempt to execute a scheme and artifice to: (1) defraud a health care benefit program affecting commerce, to wit, Medicaid, and (2) obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in the approximate value of $213,927.55, owned by, and under the custody or control of said health care benefit program; in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

9

23. It was the purpose of the conspiracy for FAULKNER and other conspirators to unlawfully enrich themselves by knowingly and willfully submitting claims to the Medicaid program containing materially false information in order to fraudulently obtain funds from the Medicaid program in connection with the delivery of and payment for health care benefits.

## Overt Acts

24. In furtherance of the conspiracy, and to effect the objects thereof, there were committed in the Eastern District of North Carolina various overt acts, including, but not limited to the following:

a.) A member of the conspiracy owned Skeen Services, Inc., a Medicaid provider that was approved to submit claims for reimbursement;

b.) A member of the conspiracy supplied the names and Medicaid identification numbers of Medicaid recipients;

c.) A member of the conspiracy supplied the name and individual Medicaid provider number of A.E.;

d.) A member of the conspiracy submitted false electronic claim transmissions to the Medicaid program using the Medicaid identification numbers of individuals who did not receive the billed services and using the name and individual Medicaid provider

10

number of A.E. indicating that A.E. had rendered the services when in fact A.E. had not rendered the services,

e.) A member of the conspiracy received the proceeds of the fraudulent claims billed to the Medicaid program;

f.) A member of the conspiracy divided the proceeds of the Medicaid fraud between the participants in the scheme.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE NOTICE

The defendant is hereby given notice that all of the defendant's interest in all property specified herein is subject to forfeiture.

Upon conviction of the offense(s) in Count One of the Information, the Defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, and, pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable by Title 28, United States Code, Section 2641(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

The forfeitable property includes, but is not limited to, the following:

- The criminal proceeds of the offense in an amount of at least $69,132.55.

If any of the above-described forfeitable property, as a result of any act or omission of the Defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the

jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any property of said defendant up to the value of the forfeitable property described above.

ROBERT J. HIGDON, JR.
United States Attorney

BY: *(signature)* John A. Parris
Assistant United States Attorney

BY: *(signature)* signing for E. Michael Heavner
Special Assistant
United States Attorney

13